## ELROD v. FOSTER et al.

No. 7560.

Court of Civil Appeals of Texas. Austin.

March 18, 1931.

Appellant's Motion for Rehearing Overruled April 8, 1931.

Critz & Woodward, of Coleman, and Wm. E. Davenport, of San Angelo, for appellant.

Butts & Wright, of Cisco, for appellees.

340

BLAIR, J.

This litigation arose out of the following facts:

On November 26, 1927, J. P. McCord, as executor of the Mrs. Martha Overall estate, conveyed to J. G. Oltorf by warranty deed 60 acres of land in Coleman county, reserving for a term of fifteen years a ⅛ oil and gas royalty or mineral interest, binding grantee to drill an oil and gas well to the depth of 2,000 feet, and providing that title should fully vest in grantee if the well proved to be a dry well. On May 11, 1928, Oltorf conveyed his ⅞ mineral interest by mineral deed to H. M. Amsler and C. C. McBurnett, who on May 28, 1928, by a contract partially in the form of an 88 producers' special oil and gas lease conveyed to Jno. R. Foster ¾ of their ⅞ interest and in part agreed as follows:

"The consideration for the execution and delivery of this lease is that the lessee, his heirs or assigns, shall on or before June 10th, 1928, spud in on some part of the 60 acres above described an oil and gas well and shall with due diligence continue the drilling of the same until it has reached a depth of two thousand feet (2,000) unless oil or gas in paying commercial quantities be encountered at a lesser depth, in which event the finding of oil or gas in paying commercial quantities shall be considered as compliance with the depth requirements in the drilling of said well."

"It is the intention of all parties hereto that lessee shall bear all expenses in connection with said first well or incident thereto. * * *

"After the first well has been completed and paid for by lessee then all additional expenses incurred in connection with drilling additional wells shall be assessed against the respective interests of the parties hereto in proportion to the interest owned by them, that is lessee's interest shall bear three-fourths of such expenses and lessor's interest shall bear one-fourth of the same.

"It is further agreed that in the operation and development of the premises herein leased after the first well shall have been completed and paid for by lessee as herein provided for, lessee shall have complete control over the operation and development of said tract of land, but at all times lessor shall have access to said lease and all wells thereon and shall be furnished by lessee with all information concerning the same, including full information on any and all wells drilled, the depth of the same, the formations encountered, and the logs of said wells.

"It is agreed and understood that should either lessor or lessee desire to sell their or his interest in said 60-acre tract at any time the other party hereto also agrees to join in said sale and sell his or their undivided interest, or in the event he or they should not desire to sell his or their interest then such party or parties as the case may be, agrees, binds and obligates himself and themselves to purchase the interest of the other party in said 60-acre lease and should a dispute arise between the parties hereto as to the value of said 60 acres and the lease thereon and said parties be unable to agree as to a value in order to consummate such sale and purchase, then and in that event lessee shall appoint one disinterested, competent and practical oil man, and lessor shall appoint one disinterested, competent and practical oil man, and when such appointments have been made the persons so appointed shall jointly appoint a third person, who shall be disinterested, competent and practical oil man, and the three said parties when so appointed shall be authorized and empowered to determine and decide upon the value of said lease, and such value shall be determined by the agreement of any two of said three arbitrators and when such agreement has been reached by said arbitrators the same shall be binding upon all the parties hereto and such findings as value, etc., shall be accepted without further question by the parties hereto."

"If the estate of either party hereto is assigned and the privilege of assigning in whole or in part is expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns."

The first well under this contract was drilled and was a dry hole but upon its completion the lease became a five-year paid-up lease under its terms, and on September 4, 1928, J. P. McCord, as executor aforesaid, acknowledged and declared in writing that the drilling of this well was in full compliance with the requirements of the deed executed by him to Oltorf so as to vest title in Oltorf. On February 1, 1930, Amsler and McBurnett, by mineral deed, conveyed the fee title to all minerals remaining in them, together with 26/128 of the ⅞ working interest covered by the five-year paid up lease to Jess Elrod, and Amsler conveyed to E. A. Tucker 6/128 of the said ⅞ working interest in the five-year paid-up lease, and thus Elrod and Tucker acquired ¼ of the ⅞ working interest of the lease, the other ¾ being at that time in Foster. Elrod and Foster were jointly interested in the operation of several producing leases in the vicinity of the 60-acre tract in controversy, and on August 17, 1929, Elrod, Foster and Tucker, the then owners of the entire ⅞ mineral interest in the 60-acre tract, as well as the working interest in said ⅞ interest, entered into a written agreement between themselves, which reads, in part, as follows:

"That this contract and operating agreement is made and entered into this 17th day of August, 1929, by and between John R. Foster of the county of Coleman, State of Texas, and Jess Elrod of the county of Tom Green, State of Texas, hereinafter called parties of

the first part and Ernest A. Tucker of the county of Tarrant, State of Texas, hereinafter called party of the second part."

"Whereas parties of the first part and party of the second part are desirous of entering into a contract and working agreement for the development of production of oil and gas on said tracts.

"That for the consideration herein set forth party of the second part desires that parties of the first part shall take charge of and operate said mineral interests in said tract and party of the second part hereby agrees, obligates and binds himself to pay his full pro rata part of all the expenses incurred in the development, operation and up-keep of said mineral interests and party of the second part hereby agrees that parties of the first part shall have full charge of the operation, upkeep and control of said mineral interests existing in said lands."

This agreement was not filed for record in Coleman county until January 2, 1930, and prior thereto, on December 23, 1929, Foster conveyed his ¾ interest to B. V. Whitfield, who purchased for himself, Jas. W. McCamey, H. N. Powell, and Jno. E. Dickson, which ¾ interest was charged at the time with a prior assignment by Foster to Elrod of a ¾28 interest as security for a $1,500 debt which Foster owed Elrod. Whitfield paid Foster $4,500 of the $6,000 cash consideration on December 23, 1929, and paid the remaining $1,500 to Elrod on December 31, 1929, on which date Elrod reassigned the ¾28 interest to Foster. On January 10, 1930, Whitfield and his associates commenced to drill the second well on the 60-acre tract, and on February 17, 1930, Elrod instituted this proceeding against the appellees Foster, McCamey, Whitfield, Tucker, Powell, and Dickson, alleging his general interest and ownership of the minerals in the 60-acre tract with them; that appellees were drilling the second well, for which he would be liable for his pro rata of the cost under the terms of the lease agreement; that he did not desire to drill the well, and that he, Foster, and Tucker had executed the joint control agreement of August 17, 1929, while they were the joint owners of the entire mineral estate in the 60 acres, and prayed for an order restraining appellees from drilling said well pending an arbitration for the purpose of agreeing on a sales price as provided for in the five-year paid-up oil and gas lease contract. A temporary injunction was granted as prayed for on February 17, 1930, and, on hearing of appellees' motion, the same was dissolved on March 8, 1930; and on March 10, 1930, appellant Elrod filed his first amended original petition, seeking a partition of the oil and gas and mineral interest in the 60-acre tract and a temporary injunction restraining appellees from drilling the second well and from incurring any further expenses in the operation of the lease, pending a

final disposition of the partition suit. Appellees filed a general demurrer, special exceptions, and pleas to the effect that they were the owners of the Foster interest in the oil and gas lease with the absolute power to manage and control, and authority to drill the well and charge appellant Elrod with his pro rata of the cost of drilling under the express terms of the lease contract; that they knew nothing of the contract between Foster and Elrod, dated August 17, 1929, at the time they purchased Foster's interest; and further pleaded that Elrod knew they were purchasing the lease from Foster for the purpose of drilling the well, and that he received the $1,500 as consideration with that knowledge, and without objection or protest, which facts estopped him from asserting that appellees had no right to drill the well, and from assessing against him his pro rata of the cost. And by way of cross-action appellees alleged that they had expended as reasonable cost for drilling the second well $4,677; that appellant's pro rata of such costs was $1,051.90, for which they prayed judgment; and they also alleged that they were further damaged in the sum of $1,000 by reason of appellant enjoining them from drilling the well between the dates of February 17, 1930, and March 8, 1930; and Globe Indemnity Company was made a party defendant as surety on appellant's injunction bond.

The trial court held that appellant had no right to partition the mineral estate under the above facts, and submitted, over appellant's various objections, two special issues which, with the jury's answers thereto, read as follows:

"First: What amount of money do you find from the preponderance of the evidence would reasonably compensate the defendants for the damages, if any, suffered by them, by reason of having their rig shut down, and their work stopped by injunction for a period of 19 days?" Answer: "$285.00."

"Second: What amount of money, if any, do you find from the preponderance of the evidence was reasonably and necessarily expended by the defendants in the drilling of the well known as well No. 2, on the lease in question, being the well drilled the early part of this year?" Answer: "$4477.00."

"You are instructed that in answering issue First submitted to you, that the defendants' damages, if any, are measured by the reasonable rental value or value of the use of the drilling machine and tools that were shut down pending said injunction."

Based upon these findings of the jury, judgment was rendered for appellees against appellant for $909.36 as his pro rata of the cost of drilling the well, and judgment was also rendered against appellant and the surety on his injunction bond for $285 as damages for the reasonable rental of the drilling

rig pending the time same was shut down by the injunction; hence this appeal.

■ The trial court correctly denied appellant a partition of his mineral estate in the 60 acres of land, because a partition of the same, either in kind or by sale and division of the proceeds, would have worked a cancellation of the oil and gas lease contract, thereby depriving all parties to it of their respective rights in the premises. We think the proposition needs no extended discussion that a part owner of a mineral estate in land, who has contracted with others having interests to pay his proportionate part of expenses of drilling and developing the premises for oil and gas, cannot demand a partition of the mineral estate so as to work a cancellation of the drilling contract, and thereby relieve himself of his proportionate part of the expenses of developing the lease.

The trial court construed the portion of the original lease contract above quoted as empowering and authorizing appellees, as assignees of Foster, to manage and control the operation of the lease, and to drill the second well so as to bind appellant for the payment of his proportionate part of the cost of drilling the well. But appellant contends that appellees had actual notice before purchasing Foster's interest of the August 17, 1929, contract between Foster, Tucker, and himself, and that they had record notice of said contract before they began drilling the well, which contract modified the terms of the original lease so as to take the exclusive control and operation of the lease from Foster or his assigns, and gave to appellant joint control with Foster of the operation of the lease; and that appellees drilled the well over his repeated protest, and were therefore not entitled to collect any costs thereof from appellant.

■ The contention that appellees knew of this contract before they purchased Foster's interest and right of exclusive control of the operations of the lease is contrary to the undisputed evidence, and for this reason the trial court did not submit that issue to the jury, and, since appellant did not record that contract until after appellees had purchased and paid for Foster's interest, he is estopped to set up any rights under same. He knew that this contract was not recorded when the negotiations were being closed with appellees. He knew that appellees were purchasing the Foster interest for the purpose of further developing the leased premises for oil and gas under the terms of the lease contract. He knew that they had paid a cash consideration of $6,000 for Foster's interest, of which Foster received $4,500, and appellant himself received $1,500 for a reassignment of the $\frac{3}{128}$ interest assigned to him as security for the debt due him by Foster. The evidence is also undisputed that he did not protest any further development of the premises until after

he had received this $1,500, and after all transactions were completely closed, and did not notify appellees of the contract upon which he now relies until shortly before they began to drill the well in question. These facts estop appellant from setting up the contract as modifying the original lease with respect to the right of Foster and his assigns to the exclusive management and control of drilling operations.

■ The trial court construed the lease contract to authorize the drilling of the second well by Foster or his assigns, and submitted to the jury only the issue of the amount of the costs of drilling the well. In the closing argument, counsel for appellant argued to the jury that a reasonably prudent man would not have drilled the second well, and appellees' counsel requested and the court gave the following special instruction to the jury:

"Now comes the defendants, J. W. McCamey, B. V. Whitfield, H. N. Powell and J. E. Dickson, after the attorney for plaintiff had concluded his argument to the jury and had argued to the jury that a reasonably prudent man would not have drilled well No. 2, and moves and prays the court before the jury has retired to instruct the jury as follows:

"Gentlemen of the Jury:

"In determining the answer to Special Issue No. 2, you will not consider whether or not it was proper or advisable to drill well No. 2, nor whether an ordinarily prudent operator would have drilled said well, but in answering said issue you will consider the amount reasonable and necessarily expended in the drilling of the well, regardless of the advisability of drilling it."

Appellant objected to this charge on the grounds that same "was argumentative on the part of the court and in effect advises the jury that the court is on the side of the appellees." We see no error in this instruction requiring a reversal of the cause. No issue was submitted to the jury with respect to whether a reasonably prudent man would not have drilled the second well, because the court construed the lease contract as authorizing the second well, and left the jury to find only the reasonable cost of drilling the well. Counsel's argument was calculated to confuse the jury, and the trial court had the right to instruct the jury as to the extent of its inquiry on the issue submitted.

■■ Appellant contends that issue No. 1 improperly submits appellees' measure of damages as being the reasonable rental value of the well machinery and rig during the time same were shut down by the injunction; but that their damages, if any, were the necessary costs or expenses of maintaining the rig while same was shut down by the injunction. Appellees owned the rig and machinery, or at least had the exclusive control of it. They

alleged and proved that they would not have been justified in moving the rig and machinery to another lease pending the time it was shut down by appellant's unlawful injunction, and they were deprived of the use of this machinery for the nineteen days that the injunction was in effect. The general rule as to the measure of damages for depriving one of the use of his personal property is the reasonable rental value during such period of time, and we see no reason why that rule should not apply here. Castleman v. Williams (Tex. Civ. App.) 263 S. W. 638; Commercial Acceptance Trust v. Farmer (Tex. Civ. App.) 241 S. W. 586; Van Velzer v. Stryker (Tex. Civ. App.) 233 S. W. 146; Brown v. Guaranty Securities Co. (Tex. Com. App.) 265 S. W. 547.

■ Nor do we think it material to appellant in what amount the damages might be apportioned among the appellees. Whitfield and McCamey were shown to have been acting for all the appellees in drilling the well, and it is therefore a matter of indifference to the appellant as to how appellees may divide the damages between themselves.

We have carefully examined all of the appellant's propositions and find that neither of them presents error requiring a reversal of the cause, and the judgment of the trial court will be affirmed.

Affirmed.

### On Motion for Rehearing.

On motion for rehearing appellant suggests fundamental error, in that, while John R. Foster could assign his interest in the lease, he could not assign his right to "complete control over operation and development," because such matters embrace covenants entirely personal in character. Whatever may be the proper construction of the contract in this respect cannot be asserted by appellant, because he is estopped to assert any construction of the contract which would interfere with appellees in the enjoyment of Foster's interest in the lease as well as his right of control of operations and development of same. The undisputed evidence shows that appellant, Elrod, knew that appellees were purchasing Foster's interest with the intention of further developing the premises. Elrod consented to the assignment by Foster and became interested in the conveyance to the extent that he received $1,500 of the consideration paid by appellees to Foster for a reconveyance of the 3/128 interest which Foster assigned to him as security for debt. Elrod never at any time objected to Foster conveying his interest to appellees, and made no complaint or objection to further drilling until the deal between Foster and appellees was fully consummated, and after he (Elrod) had received $1,500 of the cash consideration paid by appellees.

The motion will be overruled.

Overruled.